**David Lawrence ELLIOTT, Appellant (Plaintiff and Cross–Defendant below),**

v.

**Dorrell C. ROACH, H. Kirkwood Yockey, Alma M. Yockey, Appellees (Defendants and Cross–Claimants below).**

No. 2–777A280.

Court of Appeals of Indiana, Fourth District.

Aug. 28, 1980.

Michael K. Sutherlin, Sutherlin, Kennedy & Miller, Indianapolis, for appellant.

Harry E. Riddell, Indianapolis, for appellees.

MILLER, Judge.

This appeal is brought by Dr. David L. Elliott, plaintiff and counter–defendant, from the final judgment of the Municipal Court of Marion County. Following a trial

to the court, Elliott was awarded $40 against his former landlords, Alma M. and H. Kirkwood Yockey, defendants and counterclaimants, for the wrongful withholding of rental damage deposit. The court determined Elliott should receive nothing from a third defendant and counterclaimant, Dorrell C. Roach, rental agent for the Yockeys. Additionally there were judgments against Elliott on the defendants' counterclaims for defamation which alleged damages of $200,000 each. The Yockeys were individually awarded $1,500, and Roach received $2,500 for defamatory statements made by Elliott in a letter mailed to the Indiana Real Estate Commission, the Indianapolis Board of Realtors, the Independent Real Estate Brokers Association and the Better Business Bureau.

Elliott contends he should have received a larger damage award, including punitive damages, and that the judgments against him are contrary to law and should have been dismissed for lack of subject–matter jurisdiction. We affirm, holding the municipal court properly exercised its jurisdiction, pursuant to Ind. Rules of Procedure, Trial Rule 21(B), over counterclaims alleging $200,000 each for defamation despite the fact the demands of such counterclaims exceeded the then $10,000 subject–matter jurisdiction of the court over initial actions filed therein,[1] and that no errors of law were committed in awarding the judgments.

This action was commenced when Elliott filed suit with the Wayne Township Justice of the Peace for return of $64.50 of the $125 damage deposit paid to the Yockeys by Elliott and his wife. The defendants were granted a change of venue to the Municipal Court of Marion County, after which they filed an answer and their counterclaims demanding $200,000 each for the alleged defamation. The municipal court also permitted Elliott to amend his complaint to allege the wrongful withholding of $105, rather than $64.50, and to seek punitive damages of $5,000.

Although the evidence conflicted, the basic facts most favorable to the judgment are as follows: In October of 1973, Elliott and his wife, Carol, entered into a written agreement with the Yockeys for the month–to–month rental of a house on the west side of Indianapolis. The agreement provided for a monthly rent of $125 and a damage and clean–up deposit of $125. On April 29, 1974, the Elliotts were notified by letter of a rent increase of $25 per month effective June 20. The Elliotts then communicated to the Yockeys' rental agent, Mrs. Eleanor Faulknor, their intention to move by June 20. Thereafter, about June 1, Roach assumed Mrs. Faulknor's duties as rental agent; he testified he was verbally informed at that time of the Elliotts' intention to move but was not aware they had given Mrs. Faulknor written notice of their planned vacation of the premises as required by the lease terms.

After the Elliotts moved, Roach discovered certain repairs were necessary; the Elliotts' deposit was not refunded. In a letter to the Elliotts dated August 29 Roach set forth the landlords' reasons for withholding the deposit, which included lack of written notice the Elliotts were leaving, and the following:

| | |
|---|---|
| "Loss of rent for one month | $150.00 |
| Repair of storm door and bathroom sink | $ 17.50 |
| Replacement of baseboard in dining room | $ 18.00 |
| Retention of damage deposit per lease agreement due to vacating in less than one year | $ 25.00 |
| Total cost and loss to lessor | $210.50" |

All three defendants recalled speaking with Elliott at various times regarding his dam-

---

1. Neither party has suggested, and we thus do not consider, whether the "authority" of the municipal court over initial complaints is in any respect modified by Ind. Rules of Procedure, Trial Rule 75, a rule primarily concerned with venue requirements which also purports to expand the "authority" of courts to hear particular claims. *See* T.R. 75(A), (D). *But see* T.R. 75(B) (discussed *infra*) and the accompanying comments of the Civil Code Study Commission, which provides for transfer to a proper court when a court where an action is filed is not authorized to decide the case.

age deposit but denied misleading him about the amount, if any, he could expect to receive as a refund. But in a letter dated March 12, 1975, Elliott charged Roach with "misleading, deceitful, unfair and dishonest practices in his capacity as agent for H. Kirkwood and Alma M. Yockey in failing to refund money previously secured . . . as [a] damage deposit . . ." and further contended all three defendants had "exposed themselves as dishonest, unscrupulous, and unworthy of the trust or patronage of their customers or tenants." The letter, addressed to the Indiana Real Estate Commission, noted copies were sent to the defendants, the Indianapolis Board of Realtors, the Independent Real Estate Brokers Association and the Better Business Bureau.

## JURISDICTION OF THE MUNICIPAL COURT OVER COUNTERCLAIMS EXCEEDING MONETARY LIMIT ON INITIAL COMPLAINTS

We first consider the threshold question in this case of whether the municipal court had jurisdiction over the defendants' defamation counterclaims totaling $600,000 in alleged damages. Elliott contends that court should have dismissed the counterclaims because it lacked jurisdiction over tort claims in excess of $10,000 [2] and because it cannot hear any claim founded on defamation.[3] The defendants respond jurisdiction was present and, even if it were not, the proper course for the municipal court would not be dismissal, but transfer to an appropriate court. We hold jurisdiction was present pursuant to T.R.21(B). Moreover, although it is not essential to our decision herein, we observe that even where a court does not possess subject–matter jurisdiction over an action, it need not inevitably dismiss such action, but may in certain circumstances transfer the cause to a proper court pursuant to Ind. Rules of Procedure, Trial Rule 75(B) in response to a motion to dismiss filed under Ind. Rules of Procedure Trial Rule 12.

In support of his argument that the municipal court lacked jurisdiction over counterclaims in excess of $10,000 Elliott cites IC 1971, 33–6–1–2 (Burns Code Ed.), which provided in pertinent part as follows:

"Said municipal court shall have jurisdiction in the following cases:

(a) Original jurisdiction concurrent with the superior and circuit courts in all civil cases founded on contract or tort in which the debt or damage claimed or value of the property sought to be recovered does not exceed the sum of Ten Thousand Dollars ($10,000); . . . ."[4]

Elliott maintains the language of this jurisdictional statute applies to counterclaims as well as original actions and, therefore, the municipal court lacked jurisdiction over the three counterclaims for $200,000 each.

We agree that absent any contrary legislative mandate the result described by Elliott would follow from the statute. In the past this Court has analogized jurisdictional issues of the municipal court system to similar issues raised in justice of the peace cases. *See Johnson v. Greenen,* (1934) 98

---

2. The statute he cites for this proposition, IC 1971, 33–6–1–2 (Burns Code Ed.), has since been amended to increase this jurisdictional "ceiling" in the Municipal Court of Marion County to $12,500. Ind.Code 33–6–1–2–(a)(1).

3. As discussed in this opinion, *infra*, Elliott contends the Marion Circuit Court was given exclusive jurisdiction over defamation actions by virtue of IC 1971, 33–5–35–6 (Burns Code Ed.), a statute prescribing jurisdiction of the Superior Court of Marion County which expressly excluded slander actions.

We note the current statute, effective January 1, 1979, gives the superior court "[c]oncurrent and coextensive jurisdiction with the Marion Circuit Court in all cases and upon all subject–matters, . . . ." Ind.Code 33–5–35.1–4(a).

4. The amended statute now also gives the municipal court original jurisdiction in possessory actions between landlord and tenant, in actions including Class D felonies, misdemeanors and violations of various ordinances and jurisdiction to issue warrants and conduct probable

Ind.App. 612, 188 N.E. 796 [5] and *Capitol Amusement Co. v. Washington & New Jersey Realty Co.*, (1929) 90 Ind. App. 389, 164 N.E. 715. It may be generally stated that the municipal court system was created by the Legislature to replace the justices of the peace in the larger cities. *Capitol Amusement Co. v. Washington & New Jersey Realty Co., supra.* Of course, the Municipal Court of Marion County is only a limited jurisdiction court, with such powers as jurisdictional statutes confer.

We feel it was settled law in Indiana, based on a statute [6] similar to the municipal court provision, that a justice of the peace did not have jurisdiction over a counterclaim which exceeded the jurisdictional amount after crediting the plaintiff's demand. *Murphy v. Evans*, (1858) 11 Ind. 517; *Gharkey v. Halstead*, (1849) 1 Ind. 389; *Alexander v. Peck*, (1840) 5 Blackf. 308. *See also Regina Co. v. Galloway*, (1912) 50 Ind.App. 92, 98 N.E. 81. Following the language of the jurisdictional statute, the courts in the justice of the peace cases considered whether the amount *claimed* was outside the jurisdictional mandate. As observed in *Murphy v. Evans, supra*, "[w]here the amount so 'claimed' exceeds the sum named, the justice would have no jurisdiction, whether the amount be claimed by the plaintiff, or by the defendant on his set-off." *Id.* at 518.

■ The approach which was taken with respect to our justice of the peace courts is consistent with the rule followed in a majority of jurisdictions. "In general, a court which has jurisdiction of the plaintiff's claim has jurisdiction of an offset, although it is below the court's minimum jurisdiction; but it does not have jurisdiction of an offset

or cross demand which exceeds its maximum jurisdiction." 21 C.J.S. *Courts* § 66 at 84 (1940). *See e. g., Brother International Corp. v. Southeastern Sales Co.*, (1959) 234 S.C. 573, 109 S.E.2d 444 (county court); and *Broad & Branford Place Corp. v. J. J. Hockenjos Co.*, (1944) 132 N.J.L. 229, 39 A.2d 80 (district court). We hold, however, that the language of the earlier justice of the peace cases, along with the reasoning of those cases cited from other jurisdictions, is inapplicable under present Indiana law because of the provisions of T.R.21(B). That rule, adopted by our Supreme Court and enacted by our Legislature along with the other proposed trial rules at Acts 1969, ch. 191 § 1 at 546, 590, provides in pertinent part as follows:

> "(b) Effect of venue or jurisdiction over part of case. The court shall have venue and authority over all persons or claims required to be joined or permissively joined, impleaded or included by intervention, interpleader, counterclaim or cross-claim if it has venue or is authorized to determine any claim asserted between any of the parties thereto, *notwithstanding any requirement of venue or of jurisdiction over the subject-matter applicable to other claims or other parties.* The court may transfer the proceedings to the proper court if it determines that venue or authority of the court is dependent upon a claim, or a claim by or against a particular party which appears from the pleadings, or proves to be a sham or made in bad faith; and if another action is pending in this state by or against a person upon the same claim at the time he becomes a party, the court may dismiss the action as to him, or in its sound discretion, it may

case hearings. The statute also contains express exclusions discussed *infra*.

5. In *Johnson*, this court cited *Alexander v. Peck*, (1840) 5 Blackf. 308, a justice of the peace case, for the

proposition that the municipal court is not deprived of jurisdiction over an original complaint simply because a counterclaim not within its jurisdiction is filed in the same cause. The counterclaim in *Johnson* was stricken.

6. The appropriate statute stated: "Justices of the peace shall have jurisdiction to try and determine suits founded on contracts or tort, where the debt or damage claimed, or the value of property sought to be recovered does not exceed one hundred dollars; but the defendant may confess judgment for any sum not exceeding two hundred dollars . . . ." 2 R.S. 1852, ch.1 at 449.

Justice of the peace courts were abolished in 1975 by Acts 1975, P.L. 305, § 54 at 1702.

order all or part of the proceedings to be consolidated with the first pending action." (Emphasis added)

As the Civil Code Study Commission comments to this subsection explain:

"This is a new provision to avoid the expense and time of separating different claims and different or same claims with respect to different parties simply because venue requirements may differ or because the court lacks jurisdiction over the subject–matter of the litigation. Restrictions arising because of the venue laws or laws limiting the powers of courts to particular controversies constitute a real impediment to expeditious litigation and must give way to the overpowering consideration of sound procedure."

2 W. Harvey, Indiana Practice at 306 (1970).

We believe the language of T.R. 21(B) is controlling in the instant case. There is no

assertion the municipal court did not properly acquire initial jurisdiction over Elliott's claim for damages, and the amount of that claim was well within the limits of the court's statutory jurisdiction. Neither party has suggested, nor does it appear from the record, that the municipal court's jurisdiction was in any respect based on a sham or bad faith so as to involve a question of transfer under T.R. 21(B). Once Elliott's claim for damages was raised in that court, the defendants filed their answer and counterclaims; at that time the municipal court could entertain such counterclaims pursuant to T.R. 21(B), which extends authority to hear all counterclaims, whether compulsory orpermissive, where a court has acquired jurisdiction over an initial claim between the parties.[7]

We note the instant facts do not present a situation where the procedures pertaining

---

**7.** Because we conclude T.R. 21(B) extended such authority over the counterclaims we find distinguishable the federal case law associated with Fed.R.Civ.P. 13 cited by Elliott in his argument that the counterclaims must be "ancillary" to Elliott's claim for damages. Federal practice does not involve an equivalent to our T.R. 21(B).

Nor is the precise nature of Elliott's argument clear. Even assuming this case involves a so–called "permissive" counterclaim, we do not agree with the broad proposition that"[p]ermissive counterclaims must be ancillary or incidental to the principal claim." Our rule, like its federal equivalent, states "[a] pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject–matter of the opposing party's claim." Ind. Rules of Procedure, Trial Rule 13(B). In effect, "[a]ll restrictions on the right to plead a counterclaim have been removed. Civil Code Study Commission Comments, 2 Harvey, Indiana Practice 10 (1970). The discretion of a court to deny leave to file a permissive counterclaim is defined by the rule itself. T.R. 13(E), (F); Fed. R.Civ.P. 13(e), (f). See 3 J. Moore, Federal Practice ¶ 13.18 (2d ed. 1979). Moreover, we note that pursuant to T.R.13 (C), a party may file a counterclaim "exceeding in amount or different in kind from that sought in the pleading of the opposing party."

It is true federal cases have recognized a theory of "ancillary" jurisdiction over counterclaims whereby the principal claim may provide the federal subject–matter jurisdiction for an ancillary counterclaim. E. g., Aetna Insurance Co. v. Chicago Rock Island & Pacific Railroad Co., (10th Cir. 1959) 229 F.2d 584. It

appears the traditional approach in this area is that only counterclaims arising out of the same general transaction as the principal claim may be heard, without an independent showing of federal jurisdiction, and thus compulsory counterclaims under Fed.R.Civ.P. 13(a) may be decided while permissive claims under Fed.R. Civ.P. 13(b) may not. See 3 J. Moore supra at ¶ 13.15[1] and ¶ 13.19[1] and cases cited therein. As noted above, our rule expressly extends authority to "all . . . claims required to be joined or permissively joined, . . . ." T.R. 21(B). Moreover, the federal practice appears to be in a state of liberalization regarding jurisdiction over counterclaims. See generally 20001 Inc. v. Novaglas Corp., (E.D.N.Y.1973) 60 F.R.D. 649, where it is stated "pendent jurisdiction should be freely exercised to deal with non–federal, permissive counterclaims, where convenient and in the interest of judicial economy." Id. at 650 (citing United States v. Heyward–Robinson Co., (2d Cir. 1970 Friendly, J., concurring) 430 F.2d 1077, 1089, cert. denied, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971)). And see Green, Federal Jurisdiction over Counterclaims, 48 Nw.U.L.Rev. 271, 272 (1953), where it is concluded "[a]ll of the foregoing approaches point to the conclusion that a federal district court having jurisdiction over an action has the power to try all counterclaims filed in the action; " and the self–avowedly blunt conclusion in 3 J. Moore § 13.19[1], supra : "Rule 13(b) [relating to permissive counterclaims] is a good procedural provision, and it should be stripped of restrictive jurisdictional doctrines. Jurisdiction should yield to good procedure." Id. at 13–488.

to small claims litigation are applicable[8], since this case was filed in the plenary docket, rather than the summary docket, of the municipal court because Elliott's amended complaint sought damages in excess of $500.[9] Pursuant to the relevant statute, the procedure and practice in the municipal court "shall be governed, or supplemented, in all cases triable therein, and particularly so in civil cases not hereinafter excepted, by the Code of Civil Procedure at any time in effect and as supplemented by the rules adopted from time to time by the Supreme Court of Indiana; . . . ."[10] It follows from the discussion above that T.R. 21(B) is decisive of the question of the municipal court's jurisdiction over a counterclaim in excess of $10,000, or, as the amended statute now provides, $12,500.[11] Such construction is consistent, moreover, with the broad injunction that the rules "be construed to secure the just, speedy and inexpensive determination of every action." Ind. Rules of Procedure, Trial Rule 1.

In so holding, this Court is cognizant of the fundamental principle that jurisdiction may not generally be enlarged by a mere rule of court. As stated in 20 Am. Jur.2d *Courts* § 84 at 446 (1965), "[a] rule can neither enlarge nor restrict the jurisdiction of a court, nor can a rule abrogate or modify substantive law." *See also* Annot., 158 A.L.R. 699, 716–720. It is evident T.R. 21(B) involves elements which are both procedural and substantive in character. We believe the general principle expressed above is inapplicable, however, where such a rule, adopted by our Supreme Court, has further been enacted into law by the Legislature.[12] Under such circumstances, where the rule by its expressed language is applicable "notwithstanding any requirement of venue or of jurisdiction over the subject–matter," it is the function of this Court to effectuate the clear legislative intent.[13]

Nor does it appear there is any unavoidable conflict in the Legislative mandate, since T.R. 21(B) relates to counterclaims and the language of IC 33–6–1–2 prescribing jurisdictional amount is silent on that subject. Our conclusion thus recognizes the fundamental principle of statutory construction often applied by our courts

---

**8.** We observe, however, that Ind.Rules of Procedure, Small Claims Rule 5(B) provides:

> "The defendant in a counterclaim may waive the excess of his claim over the jurisdictional maximum to bring it within the jurisdiction of the small claims docket. If the defendant elects to waive a portion of his counterclaim he may not later maintain a separate action for the remainder of such claim."

**9.** The amended complaint requested refund of $105 of the damage deposit, with interest, and exemplary damages of $5,000.

Pursuant to IC 1971, 33–6–1–28 (Burns Code Ed.) (repealed by Acts 1979, P.L. 280 § 10), the municipal court had a summary docket limited to cases involving less than $500, and a plenary docket for larger claims. Simplified procedures for the summary docket were created by IC 1971, 33–6–1–29 (Burns Code Ed.) (repealed by Acts 1979, P.L. 280 § 10).

**10.** IC 1971, 33–6–1–4 (Burns Code Ed.) (repealed by Acts 1978, P.L. 2, SEC. 3308). The current statute, Ind.Code 33–6–1–11, similarly provides "[i]n all cases the rules of civil procedure shall apply, . . . ."

**11.** Neither of the parties raises the issue of whether the Legislature, in amending IC 33–6–1–2 in 1979, intended in any respect to modify the court's power over counterclaims in contravention of T.R.21(B). We find it unnecessary to address this issue since, as with the previous statute, there is no obvious conflict between that rule and the current statute so far as jurisdictional amount of counterclaims is concerned.

**12.** Acts 1969, ch. 191, § 1 *et seq.*, codified at IC 34–5–1–1 (Burns Code Ed.).

**13.** *See, e. g., Hinds v. McNair*, (1972) 153 Ind. App. 473, 287 N.E.2d 767, where it is stated:

> "[W]e, as a court of review, cannot ignore or change the clear command of the Legislature expressed in T.R. 24(C), *supra*. The appellant herein filed his motion to correct errors in the trial court within sixty days after judgment entered in the cause, and under the above quoted language of T.R. 24(C), *supra*, the motion to correct errors was timely filed."

*Id.* at 480, 287 N.E.2d at 771. We note that *Hinds* was modified in *Indiana Bankers Association, Inc. v. First Federal Savings & Loan Association*, (1979) Ind.App., 387 N.E.2d 107, to require that Ind.Rules of Procedure, Trial Rule 24(C) be construed harmoniously with Ind.Rules of Procedure, Appellate Rule 4(B)(5).

which is expressed in *Economy Oil Corp. v. Indiana Department of State Revenue,* (1974) 162 Ind.App. 658, 321 N.E.2d 215, as follows:

"There is a strong presumption that the legislature in enacting a particular piece of legislation is aware of existing statutes on the same subject. Statutes relating to the same general subject matter are in pari materia and should be construed together so as to produce a harmonious system. In this respect, when two statutes on the same subject must be construed together, the court should attempt to give effect to both; . . . ."

*Id.* at 664, 321 N.E.2d at 218.

■ Our holding that the Municipal Court of Marion County may decide counterclaims in excess of any statutory ceiling on initial complaints [14] draws support from the practices in other jurisdictions. In New York, for example, pursuant to statutory and constitutional provisions, the jurisdiction of all courts of so–called limited jurisdiction is unrestricted so far as monetary counterclaims are concerned.[15] Similarly, in Ohio where an action is properly brought in a court of limited jurisdiction, the same court has jurisdiction over a set–off or counterclaim demanding an amount which exceeds such jurisdiction, although it cannot render a judgment for any amount in excess of its statutory authority.[16] *Oglesby Granite Quarries v. Schott Monument Co.,* (1935) 54 Ohio App. 196, 6 N.E.2d 766. A counterclaimant in Ohio need not forego any action for the excess over such statutory authority because of policy considerations which the court described as follows:

"The defendant had no choice of the forum. It was brought in by compulsory process and forced to defend. If its crossclaim exceeded the jurisdiction of the forum of the plaintiff's selection, the necessity of splitting it was caused by the plaintiff. It would have been unjust to require the defendant to waive all in excess of the jurisdictional amount as a condition to the right to assert it in that court."

*Id.* at 199, 6 N.E.2d at 767. *See also* 21 C.J.S. *Courts* § 66 at 85 (1940), and cases cited therein. Pursuant to T.R. 21(B) as enacted by our Legislature, we conclude no such splitting of actions is required in Indiana, since the municipal court is therein authorized to decide counterclaims in excess of the statutory ceiling on initial complaints.

---

14. We would limit the effect of the reasoning herein to cases involving counterclaims for money damages exceeding such ceiling. A monetary limit on actions within the general purview of a court may be distinguished from express jurisdictional prohibitions. Our Legislature gave the municipal court jurisdiction over the general range of contract and tort actions but initially declined to grant such original jurisdiction beyond claims for $10,000 (now $12,500). Pursuant to T.R. 21(B) that body extended its jurisdictional grant so far as counterclaims are concerned. By contrast, the language and design of the statute, even after its recent amendment, reveals the municipal court was expressly prohibited from hearing *any* action involving the title to or partition of real estate or to declare or enforce any lien thereon (this last clause was omitted in 1979), cases in which the appointment of a receiver is asked, or in suits for divorce or annulment of marriage. *Compare* IC 1971, 33–6–1–2(a) (Burns Code Ed.) with 33–6–1–2(g), (Burns Code Ed.), and Ind.Code 33–6–1–2(a)(1) with 33–6–1–2(b). We would decline to read T.R. 21(B) in a manner which contradicts such express statutory prohibitions. Whenever possible, statutes on the same general subject should be construed to avoid such conflict. *Economy Oil Corp. v. Indiana Department of State Revenue, supra.* We need not assume our Legislature intended, for example, that any court could decide suits for dissolution of marriage simply because the dissolution petition is presented in a counterclaim. A court may presume a legislature did not intend such incongruous or mischievous results, and in interpreting a statute may consider the design and nature of the enactment and the consequences that flow from the various interpretations. *Allen County Department of Public Welfare v. Ball Memorial Hospital,* (1969) 253 Ind. 179, 184, 252 N.E.2d 424, 427.

15. *See* N.Y.Const. Art. VI, § 11(c), 15(b), 16(d), 17(a); and § 208 in each of the New York City Civil, Uniform District and Uniform City court acts.

16. In light of the unambiguous language of T.R. 21(B) our holding herein is not so limited, although we note the municipal court's judgments on the defamation counterclaims did not exceed $10,000.

## JURISDICTION OF THE MUNICIPAL COURT OVER DEFAMATION ACTIONS

Elliott further contends the Municipal Court of Marion County lacked jurisdiction at the time the instant case was heard over any action founded on defamation. He directs our attention to two statutes. The first of these, IC 33–6–1–2, gives the municipal court "[o]riginal jurisdiction concurrent with the superior and circuit courts in all civil cases founded on contract or tort . . . ." A second statute established, in part, the jurisdiction of the Superior Court of Marion County as follows: "Said court, within and for the county or counties in which it maybe organized, shall have original concurrent jurisdiction with the circuit court and court of common pleas in all civil causes except slander, . . . ." IC 1971, 33–5–35–6 (Burns Code Ed.) [17]

Elliott argues the language of IC 33–5–35–6, *supra*, gave the Marion Circuit Court exclusive jurisdiction over slander cases and thus the municipal court could not decide actions founded on defamation. In essence, he would have this Court determine that because the superior court was expressly prohibited from hearing slander actions, the Legislature must have intended to vest exclusive authority over such cases in the circuit court.

We disagree. The language quoted above from the municipal court jurisdictional statute expressly gives that court "concurrent" jurisdiction with both the circuit and superior courts; and as it is generally used, "concurrent" means "having the same authority." Black's Law Dictionary 363 (4th ed. 1968). The practice of our Legislature within the same jurisdictional statute has been to expressly state when certain subject–matters are excluded from the jurisdiction of the municipal court. Thus, the statute clearly provides:

"Said court shall have no jurisdiction in actions involving the title to or the partition of real estate, or to declare or enforce any lien thereon, and shall have no jurisdiction in cases in which the appointment of a receiver is asked or suits for divorce or annulment of marriage."

IC 1971, 33–6–1–2(g) (Burns Code Ed.) [18] We thus conclude that so far as slander actions are concerned, the Legislature intended to give the municipal court the same authority as the circuit court, subject to the initial monetary ceiling pertaining to tort and contract actions generally. Elliott does not explain why, if the Legislature intended otherwise, it purported to give "concurrent" jurisdiction to the municipal court but did not expressly exclude slander from such court's purview as it did when it prohibited the Superior Court of Marion County from hearing slander cases.[19] It is evident the

---

**17.** The statute was amended effective October 1, 1979, renaming the court the Marion Superior Court and giving it "[c]oncurrent and co–extensive jurisdiction with the Marion Circuit Court in all cases and upon all subject matters, . . . ." IC 33–5–35.1–4(a)(1).

See also *Gibson v. Miami Valley Milk Producers, Inc.,* (1973) 157 Ind.App. 218, 234, 299 N.E.2d 631, 640, where it is suggested in dictum T.R. 75 would in any event give the superior court jurisdiction over slander actions, a question we need not consider in the instant action. *See generally* 4 W. Harvey, Indiana Practice 544–45 (1971).

**18.** For current law see Ind.Code 33–6–1–2(b).

**19.** Although Elliott does not discuss Ind.Code 33–4–4–3, we do not believe such jurisdictional statute for circuit courts gives them sole authority over slander cases. The statute states:

"Said court shall have original exclusive jurisdiction in all cases at law and in equity whatsoever, and in criminal cases and ac-

tions for divorce, except where exclusive or concurrent jurisdiction is, or may be conferred by law upon justices of the peace. It shall also have exclusive jurisdiction of the settlement of decedents' estates and of guardianships: Provided, however, That in counties in which criminal or superior courts exist or may be organized, nothing in this section shall be construed to deprive such courts of the jurisdiction conferred upon them by laws, and it shall have such appellate jurisdiction as may be conferred by law, and it shall have jurisdiction of all other causes, matters and proceedings where exclusive jurisdiction thereof is not conferred by law upon some other court, board or officer."

That statute, enacted in 1881 and thus prior to the creation of the municipal court in 1926, clearly anticipates exceptions to the so–called "exclusive" jurisdiction of circuit courts. *See* 7 I.L.E. *Courts* § 131 at 535–36 (1958), where it is stated:

Legislature directed its specific attention to the exclusion of actions involving, for example, divorce or title to real estate, yet it did not include slander in the list of prohibited actions. Here again we agree with the municipal court's conclusion that it could properly exercise jurisdiction over the counterclaims at issue in the instant appeal.

## TRANSFER OF IMPROPERLY FILED ACTIONS

Our decision that the municipal court had jurisdiction over the defamation counterclaims makes it unnecessary to pass judgment on the defendants' argument that transfer, rather than dismissal, would be proper where that court lacked jurisdiction. In response to that argument we do observe, however, that transfer to a correct court may be an appropriate remedy where a court lacks jurisdiction. We note T.R. 75, which is generally concerned with preferred venue, contains in subsection (B) the following language:

"(B) Claim or proceeding filed in improper court. Whenever a claim or proceeding is filed which should properly have been filed in another court of this state, and proper objection is made, the court in which such action or proceeding is filed shall not dismiss the same, but shall order said cause transferred to the court in which it should have been filed."

"a reading of our statutes . . . discloses that in some instances courts are said to have exclusive jurisdiction of a subject matter, while in fact other courts are given similar jurisdiction and, on the other hand, some courts said to have concurrent jurisdiction with others are in fact more limited.

For example, the circuit court is given 'original exclusive jurisdiction' in all cases, but in the same act it is recognized that criminal or superior courts may have jurisdiction, as may justices of the peace. Further, while the circuit courts are given exclusive jurisdiction of the settlement of decedents' estates and of guardianships, the probate courts are also given such jurisdiction and the Vanderburgh Probate Court is given 'original, exclusive jurisdiction' in probate matters. Notwithstanding the provisions giving the Marion County Probate Court original, exclusive jurisdiction in, for example, probate and trust matters, under which the

A "proper objection" pursuant to this rule may clearly be a motion to dismiss. *See generally* 4 W. Harvey, Indiana Practice § 75.14 at 543 (1971). And as the comments of the Civil Study Commission indicate, this provision "is intended to apply to cases where the court lacks jurisdiction over the subject–matter as well as cases venued in the wrong court." *Id.* at 532.

It thus appears T.R. 75(B) may address a situation which has arisen in other jurisdictions faced with a choice between dismissal or transfer, including the circumstance where a court lacks jurisdiction over a counterclaim. In *Reger v. Grimson*, (1966) 76 N.M. 688, 417 P.2d 882, for example, the Supreme Court of New Mexico concluded "we have no statute providing for the transfer of a cause from the small claims court to the district court when a compulsory counterclaim exceeds the jurisdictional amount of the small claims court. This is a matter to which we believe the legislature should direct its attention."[20] *Id.* at 690, 417 P.2d at 884.

The court in *Reger* held the failure of a defendant sued in small claims court to assert a compulsory counterclaim for injuries sustained in an automobile accident did not bar his subsequent action in a different court to recover $30,000 for such injuries. It stated:

"[A]bsent legislation compelling or at least authorizing, a transfer of the case to

circuit court may not divest the probate court of its jurisdiction in the settlement of a partnership, and which have been said to give this court exclusive original jurisdiction, according to our more recent decisions, the jurisdiction of this court is not exclusive of the equity powers of the circuit and superior courts. Despite the provision for plenary jurisdiction in the circuit court, it has been held that the Marion County Juvenile Court has exclusive jurisdiction within its field, having jurisdiction 'concurrent' in matters pertaining to delinquent, dependent, and neglected children with circuit and superior courts in counties not having a special juvenile court." (Footnotes omitted)

**20.** The Indiana Legislature enacted the provisions of T.R. 75(B), which it originally labelled Rule 82(b), at Acts 1969, ch. 191 § 1 at 546, 707.

the district court, we are of the opinion that a defendant in a small claims court case need not plead his counterclaim, which is in an amount in excess of the jurisdiction of the small claims court. If we were to hold otherwise, the small claims court would, of necessity, be compelled to dismiss all cases in which a compulsory counterclaim is asserted, if the amount of such claim exceeds $2,000, exclusive of interest."

*Id.* at 690, 417 P.2d at 884. *Compare Reger with Metropolitan Casualty Insurance Co. of New York v. Walker,* (1942) 151 Fla. 314, 9 So.2d 361, (Florida statute requires transfer where a compulsory counterclaim exceeds the authority of a court of limited jurisdiction.) *See also Ritter v. Salsbery,* 142 Cal.App.2d Supp. 847, 298 P.2d 166.

Although our opinion today concludes T.R. 21(B) gives the municipal court jurisdiction over counterclaims regardless of the amount claimed, we note without having to decide the question that where a court does not have such subject matter jurisdiction, transfer pursuant to T.R. 75(B) may be an appropriate remedy.[21]

## THE DEFENSE OF QUALIFIED PRIVILEGE

Elliott next contends the trial court committed an error of law in awarding judgments on the defendants' counterclaims because he established as an affirmative defense that the allegedly defamatory letter in which he accused Roach of being misleading and deceitful and charged each of the counterclaimants with being unscrupulous and dishonest was protected by a qualified privilege and there was no showing of actual malice on Elliott's part to overcome such privilege. He thus advances a principle which has long been recognized by our courts in defamation cases and summarized in 18 I.L.E. *Libel and Slander* § 52 at 475 (1959) as follows:

"The rule concerning a qualified privilege is that a communication made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty, is privileged."

(quoted in *Indianapolis Horse Patrol, Inc. v. Ward,* (1966) 247 Ind. 519, 524, 217 N.E.2d 626, 628–29; and *Weenig v. Wood,* (1976) 169 Ind.App. 413, 434, 349 N.E.2d 235, 248.) *See also* 50 Am.Jur.2d *Libel and Slander* § 195 at 698 (1970) and Restatement (Second) of Torts § 596 (1977).[22]

It has been said such privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have a common interest or duty. 50 Am.Jur.2d *Libel and Slander* § 195 at 699 (1970). Thus, courts have recognized a privilege extends, for example, to statements and communications made in connection with membership qualifications and the various activities of lodges, societies, labor unions, professional associations and similar organizations. *Indianapolis Horse Patrol, Inc. v. Ward, supra; and see* 50 Am.Jur.2d *Libel and Slander* § 206 at 715 (1970). Similarly, the privilege may protect communications made to one entitled to act in the public interest, as in the case of statements to prosecuting attorneys and law enforcement officers. *Id.,* § 214 at 726 (1970). As summarized in Restatement (Second) of Torts (1977):

"§ 598. Communication to One Who May Act in the Public Interest

An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

(a) there is information that affects a sufficiently important public interest, and

---

21. We also observe that where title to land is properly put in issue, certification by the municipal court to a court of appropriate jurisdiction is required by Ind.Code 33–10–7–1.

22. The Restatement therein provides:

"§ 596. Common Interest

An occasion makes a publication conditionally privileged if the circumstances lead any

one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know."

(b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true."

Elliott in essence argues the various organizations to which he sent his letter shared with him a common interest in addressing his grievances and thereby in regulating the real estate practices of the counterclaimants. He further implies, in the alternative, that he at least reasonably believed such a shared interest was present.

 In viewing such arguments, this court is cognizant not only of the broad legal categories represented by such terms as "interest" and "duty," but also of an underlying consideration whenever privilege is alleged—namely, whether the evidence shows the defamer in fact acted for a privileged purpose and in good faith. It has properly been held

"The privilege attaches only if the communication was made in good faith to serve the interests of the publisher and the person to whom it is addressed, and it does not exist if the privileged occasion was abused. There is no privilege if the publication was made primarily for the purpose of furthering an interest that is not entitled to protection, or if the defendant acted principally through motives of ill will, or, so it is held, if he acted recklessly. *Whether a defendant acted in good faith in making a statement usually is a question of fact for the jury.*" (Emphasis added)

50 Am.Jur.2d *Libel and Slander* § 197 at 702–3 (1970). It is commonly recognized, for example, that " 'the privilege is lost if the defamation goes beyond the group interest, or if publication is made to persons who have no reason to receive the information.' " *Weenig v. Wood, supra* 169 Ind. App. at 435, 349 N.E.2d at 248, *quoting* W. Prosser, Law of Torts 791 (4th ed. 1971).

*See also* 1 Harper & James, The Law of Torts 445 (1956). As the phrase "qualified or conditional privilege" suggests, such privilege does not change the actionable quality of the words published, but merely rebuts the inference of malice that is imputed in the absence of privilege. 50 Am. Jur.2d *Libel and Slander* § 195 at 698 (1970). In an appropriate case, a trier of fact may determine the privilege was abused by excessive publication, by use of the occasion for an improper purpose, or by lack of belief or grounds for belief in the truth of what is said. W. Prosser, *supra*, at 792–96. And although the term "malice" is frequently applied in viewing such acts, it appears "the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which the privilege exists." *Weenig v. Wood, supra* at 436, 349 N.E.2d at 249.

Thus, it becomes evident the legal question of a shared interest or duty is also associated with a factual consideration of whether the defamer acted for a protected purpose. *See* Restatement (Second) of Torts (1977), where it is stated in § 603:

"One who upon an occasion giving rise to a conditional privilege publishes defamatory matter concerning another abuses the privilege if he does not act for the purpose of protecting the interest for the protection of which the privilege is given."

 Turning our attention to the instant case, we cannot say Elliott's accusations were protected as a matter of law, since there is evidence for the fact–finder that he acted outside the purpose of any privilege which may have arisen. In so holding, this Court recognizes a qualified privilege will generally protect grievances filed with an appropriate regulatory body such as the Indiana Real Estate Commission.[23] Even

---

23. In discussing the Real Estate Commission Elliott directs our specific attention to Ind.Code 25–1–3–3, an immunity statute pertaining to regulatory bodies of licensed professions in general which provides:

"Any person shall be immune from civil liability for damages for any sworn or written statements, made without malice, and transmitted to the regulatory board, executive secretary, or his staff, or made in the course of

assuming, however, Elliott acted in good faith by filing formal complaints with that Commission, a fact–finder could also decide he acted outside any privilege by simultaneously mailing copies of the complaints to various unofficial bodies, at least where one or more of those bodies had no specific interest in the acts of the alleged wrongdoers and it appears the defamer may have utilized such organizations merely to circulate his damaging views throughout a profession. In such a case, one may reasonably decide there was excessive publication. In arriving at such conclusion, we rely on inferences derived from Elliott's letter itself, as well as from evidence elicited at trial.

Our analysis first considers the evidence, or lack of it, establishing the authority, function and memberships of the various organizations to which Elliott directed his letters.

As noted above, Elliott in the instant case filed complaints with the Indiana Real Estate Commission against Roach, who he admittedly knew to be a realtor, and also against the Yockeys. At the same time he mailed copies of his complaints to three other organizations identified as the Indianapolis Board of Realtors, the Independent Real Estate Brokers Association [24] and the Better Business Bureau, and on the same day he initiated this lawsuit. It further appears from the evidence, however, that at all times relevant to the instant action, none of the parties herein was a member of the Indianapolis Board of Realtors and H. Kirkwood Yockey, an attorney, was not a real estate broker licensed by the Indiana Real Estate Commission. Indeed, it may be inferred from Elliott's letter he had identified only Roach as a real estate broker since the Yockeys are referred to merely as "former owners" of rental property, and Mr. Yockey is also described as an attorney, while Roach is clearly labeled as an "independent real estate broker." [25] Although it may possibly be concluded from other evidence [26] that Roach belonged to the Independent Real Estate Brokers Association, there was no specific evidence of that body's membership, or indeed of its function or authority to discipline these counterclaimants or anyone else. Finally, there was no evidence any of the parties belonged to the Better Business Bureau, although such fact is not essential to our reasoning herein.[27]

investigatory, hearing or review proceedings."
We conclude we need not consider the reach of that immunity statute, since we find there is evidence Elliott acted outside the privilege when he mailed letters to various other organizations he apparently identified with real estate and "the business community in general." It could not be contested that every repetition of the letter is a publication itself and independently actionable. W. Prosser, *supra* at 768.

**24.** Not mentioned in his motion to Correct Errors, but for the first time raised in his reply brief, Elliott blandly asserts "the Independent Real Estate Brokers Association was defunct and never did reply to Appellant [sic] letter." We note there was evidence of the existence of such organization, in the form of a letter from Roach addressed to that body, specifically directed to a particular individual, describing the exonerating findings of the Indiana Real Estate Commission. A partially readable emblem on Roach's letter suggests his possible affiliation with that body.

**25.** It thus appears, as discussed in this opinion *infra*, that Elliott did not regard Alma Yockey as being licensed by the Indiana Real Estate Commission, although testimony disclosed she is such a licensed broker.

Because we conclude there was evidence Elliott's communications were outside any applicable privilege, we need not consider the Yockeys' arguments that the letters to the Commission were not privileged in light of the provisions of IC 1971 25–34–1–22 (Burns Code Ed.) (repealed effective December 31, 1979). For current law *see* Ind.Code 25 ·34.1-3–2). That statute generally exempts landowners from the real estate licensing Act in transactions involving the lease of their own property.

**26.** As noted earlier herein, a partially readable emblem on Roach's stationery introduced for a different purpose (see note 24 *supra*) appears to identify Roach as a member of the "IREBA." In addition, Roach's letter to Elliott dated August 29, 1975 describing the reasons for withholding the Elliotts' damage deposit, discussed earlier in this opinion, bore a similar emblem.

**27.** We observe it may be that a court can judicially acknowledge a Better Business Bureau, like a Chamber of Commerce, is an appropriate forum for grievances concerning alleged improper business practices even where non–

█ In viewing such facts, we do not say the privilege must fail in this case merely because a defamer directs his statements to parties who have no specific interest or authority to act, since he may make a reasonable mistake regarding such interest. But we do believe such facts, combined with the other evidence considered herein, may support the inference the defamer acted outside a protected purpose, particularly where he was aware of an appropriate licensing body (Indiana Real Estate Commission) and had already directed his formal complaints to that organization.[28] In such a case a fact–finder is entitled to believe the defamer acted excessively merely to widely circulate his views throughout a profession in a manner which would frustrate any opportunity for the alleged wrongdoer to establish his innocence.

In this context, we believe it is helpful to observe the consideration given by our Supreme Court in *Coombs v. Rose*, (1846) 8 Blackf. 155, 157, to the limits and purpose of the qualified privilege. The Court therein stated:

" [w]e have come to the conclusion that it is not proper to extend the protection to a member of the church, when, on such an occasion, he implicates the character of a stranger to the rules of the church, who is not amenable to its authority, and who has no opportunity to repel an opprobrious accusation before the tribunal which is to try it. We are aware that the restriction of the privilege to actions between the members of a church, may sometimes embarrass the enforcement of wholesome rules of discipline; but it is equally obvious, that to extend it beyond such actions may sometimes cause irreparable injury to the character of innocent persons."

In *Coombs*, the plaintiff sued for damages when he was indirectly accused of perjury by one church member who charged another church member with not reporting what he knew to be a lie. Since the plaintiff was not a member of the same church and thus had no recourse before that body, his cause of action was not defeated.

It has similarly been held in other jurisdictions that the privilege need not protect grievances filed with parties who lack authority to act on the contested issue, perhaps because the injured party has no forum in which to show his innocence. *See Magness v. Pledger*, (Okl.1959) 334 P.2d 792 (a petition directed to an attorney general charging another with embezzlement was not protected where the attorney general was not statutorily empowered to investigate crimes); and *Koehler v. Dubose*, (Tex. Civ.App.1918) 200 S.W. 238 (no privilege applied to a generally circulated petition urging denial of the renewal of a liquor license when no proceeding for renewal of the license was pending).

In the instant case, though we do not say the privilege was inapplicable as a matter of law, it nevertheless appears there was evidence Elliott acted outside any purpose by excessively publishing his defamatory remarks. We observe, in cases such as this, that the mere opportunity for the injured party to deny the charges may often prove inadequate, particularly where the recipient organization does not and indeed cannot conduct any investigation. In the instant case, for example, there was testimony the Indianapolis Board of Realtors took no action when it received Elliott's letter, other than holding the same in its files, because none of the parties was a member of said Board. The testimony clearly showed there was no procedure employed to investigate complaints against non–members.[29] Even

---

members are concerned. *See generally Hollander v. Pan American World Airways*, (D.Md. 1973) 382 F.Supp. 96, where there appears to have been no specific showing of authority of a Chamber of Commerce with respect to a motel.

**28.** There was also evidence of a separate complaint form filled out by Elliott addressed to the Better Business Bureau, although that com-

plaint was formally directed *only* against "Dorrell C. Roach Realty."

**29.** There also was evidence that at the time of trial Roach was currently being considered for membership by that Board. We do not believe, however, that Elliott's argument that such body could "take any unresolved complaint into consideration when a party makes application"

though Elliott mailed copies of his letter to each of the counterclaimants and noted thereon where he had distributed his comments, a fact–finder is not required to consequently believe Elliott acted in good faith. Indeed such actions may equally support an inference the defamer intended to pressure the accused parties into acquiescing in his demands without any proper investigation, which is itself an unprotected purpose.

Courts have held the protection will not apply where there is an excessive publication.

> "As a general proposition, the publication of a defamatory statement qualifiedly privileged should go no further than is required by the moral or social duty to publish, and if a publication is designedly or unnecessarily or negligently excessive, the privilege is thereby lost, or at least, whenever a defendant deliberately adopts a method of communication which give unnecessary publicity to statements defamatory of the plaintiff, the jury will be apt to infer malice."

50 Am.Jur.2d *Libel and Slander* § 238 at 801. We note in the context of negligent communication there was no evidence Elliott even attempted by telephone or otherwise, to first determine the interest or function of these various organizations before mailing copies of his detailed written accusations.

■ Where it appears a communication may have been excessively published, the fact–finder is entitled to assess the defamer's good faith in communicating to the allegedly interested parties. *Berry v. Moench*, (1958) 8 Utah 2d 191, 331 P.2d 814, discussed in Annot., 73 A.L.R.2d 325, 330. In *Berry*, Dr. Moench, a psychiatrist who had treated the plaintiff Berry, was sued for libel after responding in a manner derogatory to Berry to an inquiry from another physician, Dr. Hellewell, for information to be passed on to the parents of Berry's prospective bride. The psychiatrist's letter was ultimately relayed to the bride's parents, and by them to their daughter, Mary Boothe, who did in fact marry Berry. In considering the alleged privilege the court observed it "must be exercised with certain cautions," including the requirements of good faith, reasonable care, and distribution only to such persons as are necessary to the purpose. *Id.* at 199, 331 P.2d at 819.

Here, even assuming Elliott merely intended to initiate disciplinary action when he wrote the Indiana Real Estate Commission and perhaps even to the Better Business Bureau, a fact–finder was entitled to consider whether he acted excessively by mailing copies of his complaint to other unofficial organizations, when he had apparently accomplished his purpose and such other organizations had only at most a remote interest in the matter. We note in *Berry* the Court observed:

> "Neither Mary Boothe nor Mr. Berry were patients of Dr. Moench or Dr. Hellewell, nor had any personal relationship of any character with them. Dr. Hellewell was not acting as a physician to either of them, nor to the Williamses. His only objective was in doing what he regarded as a favor to the Williamses who had been his patients. He can properly be regarded only as an intermediary, who was intended to pass the information on through other intermediaries, the Williamses, to the person directly concerned. The likelihood of the parents being greatly concerned and disposed to talk to others about the matter may be taken into account. Conceding that Mary Boothe had such an interest that Dr. Moench properly thought she should be given the information, it seems to us that reasonable minds might entertain the thought that a more direct method of getting the information to her should have been employed than to relay it through others,

alters the inference that he may initially have been unconcerned with the specific authority or interest of the Board. Such argument anticipates that his damaging accusations may re-

main "unresolved" precisely because the Board would lack any clear interest in the matter until it might act on an application for membership.

even though they had made the inquiry in her interest."

*Id.*, at 200–1, 331 P.2d at 820.

Turning our attention again to the facts of the instant case, we find further evidence in the language of Elliott's letter itself supporting the inference that he acted excessively, out of a desire to widely distribute his opinions even to marginally interested parties. Because of its relevance to this issue and our decision, we quote that letter in its entirety:

"1274 Farley Drive
Indianapolis, Indiana 46224
March 12, 1975

Indiana State Real Estate Commission
State Office Building
Indianapolis, Indiana 46202

Gentlemen:

I am hereby lodging a formal complaint against Dorrell C. Roach, an independent real estate broker with offices at 4830 West Sixteenth Street, Indianapolis, Indiana, for misleading, deceitful, unfair, and dishonest practices committed in his capacity as agent for H. Kirkwood and Alma M. Yockey in failing to refund money previously secured from us by H. Kirkwood and Alma M. Yockey as damage deposit on rental property and rightfully due us, David L. and Carol A. Elliott, in the specific amount of $64.50.

As described in the enclosed supporting documents, Mr. Roach repeatedly misled us as to when refund of our deposit would be made, falsely led us to believe that such refund would indeed eventually be made, and finally refused to refund any money for reasons which are patently false and about which he openly and blatantly lied.

I am also hereby lodging a formal complaint against H. Kirkwood Yockey, an attorney with offices located at 300 Union Federal Building, Indianapolis, Indiana and Alma M. Yockey, his wife, former owners of rental property located at 6515 West Twelfth Street, Indianapolis, Indiana, for failure to refund damage deposit funds rightfully due us in the amount of $64.50.

The amount of money involved in our case alone is trivial and unimportant. What concerns me most, and what prompted this complaint, are the methods which have been employed to deprive us of funds rightfully ours, regardless of the amount. I am also concerned, however, for the vast number of tenants in situations similar to ours. Landlords have at their disposal tremendous sums of money in the form of damage or security deposits secured from many tenants. While I believe that the majority of landlords are fair and conscientious in dealing with their tenants, too many take advantage of tenants by capriciously withholding, or delaying repayment of, deposit funds, knowing full well that tenants have little, if any, recourse. Such funds can, in the aggregate, constitute a significant portion of a landlord's income or cash flow, certainly enough to tempt some to unfairly retain them if they can. It is usually simply too expensive for a tenant to attempt to force a landlord to refund deposit funds unfairly withheld, the deposits usually being in amounts less than $200.00.

I feel it is important to bring these facts to your attention. By employing such tactics, Mr. Roach and Mr. and Mrs. Yockey have discredited your respective organizations and the business community in general. They have exposed themselves as dishonest, unscrupulous, and unworthy of the trust or patronage of their customers or tenants. I intend to contest them for recovery of the funds rightfully due us.

Respectfully yours,
/s/ DAVID L. ELLIOTT
David L. Elliott

cc: Dorrell C. Roach
H. Kirkwood and Alma M. Yockey
Indianapolis Board of Realtors
Independent Real Estate Brokers Association
Better Business Bureau
File x 3"

As we noted above, it is a fair inference from Elliott's letter he had identified only Roach as a real estate broker, since only Roach is described as a broker and the complaint initially deals with his alleged improprieties. Of course, copies of the complaint were nevertheless mailed to what outwardly are brokers' associations, thus allowing a fact–finder to consider whether Elliott actually believed any or all of the counterclaimants had "discredited" such organizations. Although Elliott testified he reasonably believed such bodies are authorized to regulate and "monitor" ethical practices throughout the real estate profession, we note he also charges the counterclaimants had discredited "the business community in general," and that he desired to bring such fact to the attention of these specific organizations. Even assuming he acted from such generally laudable impulses, we must observe that, absent a more particular shared interest, the "natural interest of the general citizenry" in such matters does not give rise to the protection of a privilege. *See generally Rosen v. Reed,* (1977) La.App., 351 So.2d 1284 (defamatory statements to Rotary Club by law enforcement official concerning an alleged criminal were not protected.)

Finally, we believe the extreme accusations in Elliott's letter also support an inference that, at least so far as the Yockeys are concerned, he acted without a reasonable regard for the truth and is thus not entitled to the protection of a qualified privilege. *See Weenig v. Wood, supra,* and *Berry v. Moench, supra.* In *Berry,* the Court correctly stated "[i]t seems hardly necessary to state that one cannot pass on derogatory information indifferent to its truth, or the consequences thereof, but failure to exercise reasonable care and diligence to ascertain the truth destroys the privilege." *Id.* at 199, 331 P.2d at 819.

We observe Elliott accused the Yockeys not only with having discredited the real estate profession and the business community in general, but also with "having exposed themselves as dishonest, unscrupulous, and unworthy of the trust or patronage of their customers or tenants." More-

over, he at least inferentially implied that Roach and the Yockeys withheld the damage deposits of others besides himself, since in the course of his complaint he alleges many landlords "take advantage of tenants by capriciously withholding, or delaying repayment of, deposit funds" and that "[s]uch funds, in the aggregate, constitute a significant portion of a landlord's income or cash flow." Of course, the trial court implicitly found such accusations to be untrue in this case, since it awarded judgments on the counterclaims, and Elliott presented no evidence of general improper practices by these counterclaimants involving other tenants. Additionally, in this context we find significant the following testimony elicited from Elliott at trial:

"Q What did the Yockeys do that was dishonest?

A Mr. and Mrs. Yockey, by virtue of hiring Mr. Roach, were the principals in the whole matter."

From such evidence it may at least be concluded Elliott's principal basis for calling the Yockeys dishonest and "unscrupulous" was that they hired Roach. Since none of the allegedly improper practices occurred until sometime after Roach was hired, we believe the court could reasonably have found Elliott's accusations, as supported by his own testimony, were reckless.

With regard to the possible recklessness of Elliott's accusations against Roach, an examination of Elliott's testimony reveals three specific instances in which he alleged he was misled or lied to by Roach from which a trial court could perhaps conclude he acted recklessly under the circumstances in making such accusations. First, he stated Roach lied about not receiving written notice of the Elliotts' plans to vacate. Second, Elliott alleged Roach lied in representing there was a conversation between Roach and the Yockeys prior to August 28, 1974 in which the Yockeys told Roach not to refund the Elliotts' deposit. Finally, Elliott contended that Roach misled him at one point by stating Elliott was "assured" of an $82.00 refund.

The first two of these accusations concerned events which occurred during a few days in late August, at which time negotiations between the parties over the Elliotts' damage deposit culminated. Elliott testified that up until August 28, 1974, his relationship with Roach had been "very friendly." The Elliotts had vacated their apartment approximately June 20, pursuant to a written notice of April 30 which had been delivered to the Yockeys' rental agent at the time, Eleanor Faulknor. According to the evidence, Mrs. Faulknor left her position in May, at which approximate time Roach assumed her duties as rental agent. Mrs. Faulknor stated that when she left, she readied the various rental contracts and the written notice, showed them to Roach, and at that time verbally informed Roach of the Elliotts' intention to vacate about June 20. Elliott further testified that about a month before he vacated, Roach told him he could probably expect to receive about $82.00 of his deposit. Thereafter, on August 28, he contacted Roach, who allegedly told Elliott "that he had discussed the matter with Mr. and Mrs. Yockey and they had agreed no damage deposit would be refunded." Elliott stated a few minutes later he called Mrs. Yockey, who said she had not talked to Roach about the deposit, but that she would contact Roach and insure Elliott received a prompt reply. Elliott concedes he received such reply from Roach a day or two later. Roach stated that after talking with the Yockeys on the 28th he telephoned Elliott. It was apparently at that time that Elliott, according to his own testimony, called Roach a liar because he did not acknowledge receiving any written notice from the Elliotts, to which Roach allegedly offered "no specific reply", but said the Elliotts "would be getting a letter the following day." Elliott admits he received such letter, dated August 29, quoted in part earlier in this opinion, which explained the reasons why the Elliotts' damage deposit had not been refunded. Among the reasons given was the allegation the Elliotts had "failed to give written notice that you were vacating the property thirty (30) days in advance of moving out."

Although Roach now concedes in his brief Elliott gave written notice to Mrs. Faulknor, he also testified he did not knowingly misrepresent such fact when he wrote to the Elliotts, and even at the time of trial he had never actually seen a copy of their written notice. No copy of such notice had been discovered at the time of trial.

Based on such evidence, Elliott testified he concluded Roach had lied to him regarding the existence of any written notice. He concedes, however, that he had never directed any notice to Roach personally, and by his testimony acknowledged there could have been a misunderstanding when Roach assumed Mrs. Faulknor's duties as agent for the Yockeys:

"Q. It [written notice] wasn't given to Mr. Roach, was it?

A. Actual notice was given to Mr. Roach.

Q. Not written notice, was it?

A. Written notice was given to Mrs. Faulknor.

. . . . .

"Q. What's in your—what was in your mind, Mr. Elliott?

A. In my mind Mrs. Faulknor—it didn't matter to me whether Mrs. Faulknor or Mr. Roach, I had given proper written notice to the parties appropriately.

Q. Well, in your opinion, couldn't Mr. Roach have as equally a misunderstanding or an understanding as to what he thinks it ought to be?

A. That's conjecture, but surely."

A second accusation by Elliott concerned events which occurred during the same time period. Elliott testified that when he talked with Roach by telephone regarding the damage deposit on August 28, Roach told him that pursuant to an earlier talk between Roach and the Yockeys, no part of the deposit would be refunded. Elliott further testified that "moments later" he called Mrs. Yockey, however, and at that time Mrs. Yockey denied she had spoken with Roach about the deposit, "indicating to

me that Mr. Roach had lied to me on the phone at that time." Assuming such testimony was offered to support Elliott's assertion in his letter that Roach acted deceitfully, we believe the fact–finder may have been entitled to conclude Elliott acted recklessly in assuming, based on such conflicting stories, that *Roach* had necessarily lied. Certainly it was equally plausible to suppose either Roach or Mrs. Yockey were mistaken in their recollections regarding this particular deposit–an inference made more likely by evidence that Roach managed several properties for the Yockeys in connection with his independent real estate business. Moreover, even assuming that one or the other was untruthful, Elliott's own account of the events in question offers *no* basis for Elliott to have concluded it was necessarily Roach who lied.

Finally, Elliott also testified Roach had "assured" him of a refund and that he had thereby been misled. Although Roach testified he told Elliott at the outset only the Yockeys could make a final decision on the deposit, it is questionable whether even Elliott's account reasonably suggests there was a deliberately misleading assurance by Roach. The only explicit testimony regarding such an assurance was an initial conversation regarding damages in late July which Elliott summarized as follows:

> "The first conversation, uh, was that they had made note of the fact that the baseboards had been removed, and we discussed the reasons for having done that, and he indicated to me at that time that the home was under–was going to be appraised and that *if the home passed appraisal without any additional repairs, then I would be refunded a check for approximately Eighty–Two Dollars* ($82.00)." (Emphasis added)

This assertion, obviously conditional in nature, does not support Elliott's claim he was "assured" of an $82 refund.

▮ To summarize, in support of the trial court's general finding we conclude there was evidence presented from which the court could have found Elliott did not act in good faith, but rather exceeded the protected purpose and thereby abused any privileged occasion which may have arisen. By excessively publishing copies of his derogatory letter–which broadly alleged that the counterclaimants were unscrupulous and had discredited the business community "in general"–to private organizations which shared with Elliott no special interest in his accusations, even though he had already identified an appropriate official body charged with investigating such grievances, Elliott by his acts raised an inference he did not act reasonably and in good faith. It is clear both of these are essential requirements of the protection afforded by a qualified privilege. *Weenig v. Wood, supra.*

Even assuming *arguendo* he might have acted in good faith, the evidence does not require or even support Elliott's further conclusion that each of the organizations to which he sent his damaging remarks "have a duty to respond." In light of such fact, a falsely accused wrongdoer may effectively be denied an opportunity to establish his innocence, *Coombs v. Rose, supra,* making it especially significant that the trier of fact be entitled to assess the reasonableness of the defamer's actions and beliefs. The potential harm is compounded where there is evidence, as noted herein, the defamer was reckless in his regard for the truth. Such evidence is relevant to assessing his good faith exercise of any privilege. *Weenig v. Wood, supra,* 169 Ind.App. at 439, 349 N.E.2d at 251. We thus conclude Elliott's damaging accusations were not protected as a matter of law.[30]

---

**30.** We do not believe Elliott presents a cogent argument, pursuant to Ind. Rules of Procedure, Appellate Rule 8.3(A)(7), that his defamatory remarks were protected by Article 1, section 9 of the Indiana Constitution. He contends merely that·it is "possible" his publications can be construed as falling within the protections accorded to publication media concerning mat-

ters of public or general concern, a so–called "constitutional privilege" discussed in *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.* (1974) 162 Ind.App. 671, 321 N.E.2d 580, *cert. denied,* 424 U.S. 913 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). In any event, such argument is based solely on the theory his remarks were made "to the proper regulatory

## THE DEFENSE OF JUSTIFICATION

Elliott's final challenge to liability under the defamation counterclaims is his contention his damaging accusations were "justified" because they were "true" and "provoked" by the acts of the counterclaimants. He argues that on the facts presented, such justification is a complete bar to liability, and in connection with that defense cites Ind.Code 34–1–5–2, which provides as follows:

"In all actions mentioned in the last section [pertaining to libel and slander], the defendant may allege the truth of the matter charged as defamatory and mitigating circumstances to reduce the damages, and give either or both in evidence."

In response to such argument, this Court recognizes that as a general proposition, proof of the truth of an alleged defamation has been held to be a complete defense to a civil action for libel. *Palmer v. Adams*, (1894) 137 Ind. 72, 36 N.E. 695, citing Ind.Const., art. 1, § 10.[31] *See also* 18 I.L.E. *Libel and Slander* § 62 (1959). We also observe, however, that whenever the question arises, the defamer bears the burden of proof on this issue of fact, since "truth" is an affirmative defense to a claim for libel. *Weenig v. Wood, supra*. Moreover, when an alleged defamer such as Elliott appeals a negative judgment on the issue of truth, a Court on appeal may hold in his favor only if it determines *no* reasonable trier of fact could have decided his accusations were untrue. *Id.*

The evidence in the instant case does not compel such a conclusion. There clearly was conflicting evidence concerning the truth of Elliott's accusations. Indeed, as noted herein, there was some indication not only that his defamations were untrue, but also that Elliott's regard for the truth in making such comments was reckless. Thus, although it is possible he presented evidence which might arguably mitigate a damage award, there clearly was additional evidence in the record suggesting what may have appeared to be lies and deceit in Elliott's eyes were in essence only an honest misunderstanding giving no occasion to his extreme accusations. Elliott presents no cogent argument to the contrary. Rather, he contradictorily maintains with reference to this issue that the counterclaimants "falsely" stated they were not aware of any written notice *and* that the "[d]efendants made no attempt to verify with their former real estate agent, Mrs. Faulknor, whether or not such a letter was received." In so arguing, Elliott in essence concedes what the counterclaimants testified—namely, that they made no knowing misrepresentation to Elliott regarding his written notice to vacate, because they had not learned from Mrs. Faulknor that such notice existed. Assuming *arguendo* the counterclaimants were negligent, it does not follow they acted dishonestly. Similarly, even if we assume as Elliott contends that Roach and the Yockeys misapplied the terms of the Elliotts' lease in charging $150 for lost rental income and $25 for terminating the "month–to–month" lease in less than one year, we do not believe such facts—even when combined with the counterclaimants' delay in acting on the deposit—require a conclusion that Roach and the Yockeys acted dishonestly or in an unscrupulous manner. The trial court was entitled to exercise its discretion as fact–finder in weighing such evidence.

Nor do we believe, in response to Elliott's further argument, that the trial court's award of $40 on his claim "would imply that . . . [he] was right" in making such accusations in his letter. The court could easily have found the counterclaimants, though not guilty of the deceptive practices alleged by Elliott, were nevertheless mistaken in withholding all of his deposit.

Finally, we observe Elliott also maintains he was denied an opportunity to

authorities and agencies" for the purpose of correcting dishonest practices, a conclusion which we have already determined was unwarranted.

31. It is therein stated "[i]n all prosecutions for libel, the truth of the matters alleged to be libellous may be given in justification."

show the truth of his accusations regarding H. Kirkwood Yockey because the trial court improperly prevented his witness Charles Beck from testifying on "specific acts of dishonesty and deceitfulness." In response to such argument, we must note Elliott did not make an offer to prove, pursuant to Ind. Rules of Procedure, Trial Rule 43(C), stating what Beck's testimony would have been. Absent such offer to prove, Elliott's argument is waived on appeal because neither this Court nor the trial court could properly determine its merits. *See, e. g., Strickland v. State,* (1977) 265 Ind. 664, 359 N.E.2d 244 and *Swartz v. State,* (1966) 247 Ind. 166, 214 N.E.2d 165. *See also* M. Seidman, The Law of Evidence 47 (1977). We cannot merely assume that Beck, who stated he had worked as a law clerk and as an attorney in Yockey's law firm, would have testified about acts relevant to Elliott's justification defense in this action.[32] We correspondingly hold that the trial court did not err in excluding his testimony, or in rejecting Elliott's defense that his accusations were true.

## DAMAGES UNDER THE DEFAMATION COUNTERCLAIMS

In addition to challenging his liability under the counterclaims, Elliott further maintains the municipal court erred by awarding excessive damages to the counterclaimants in their actions for defamation. As noted earlier in this opinion, such award consisted of $1,500 to each of the Yockeys,[33] and $2,500 to Roach, making a total of $5,500. The counterclaims had each demanded damages of $200,000, which included the $100,000 alleged compensatory damages and $100,000 punitive damages. The judgment of the court did not distinguish between these two kinds of damages.

In attacking such awards Elliott presents several arguments, the first of which is that the counterclaimants presented only their own testimony that his accusations resulted in any lost income or harm to their community standing, and further failed to establish that their reputations prior to such accusations were good. He cites no authority, however, that such evidence is required or that there was insufficient evidence to sustain the judgments.

Without purporting to pass on the relevance of each item offered, we initially take note of the evidence the counterclaimants did present on the question of damages. Thus, there was testimony by Yockey he is a practicing attorney whose professional reputation was damaged by Elliott's accusations. He also stated that of three formal complaints which had been filed against him as an attorney during such career, the Indiana Supreme Court Disciplinary Commission found in his favor in each case. With specific reference to Elliott's charges in his letter, Yockey introduced into evidence a reply letter, signed by Yockey, stating his law firm was representing the counterclaimants and denying the alleged improprieties. Yockey stated he mailed that letter to the various organizations contacted by Elliott, and further estimated the total value of his time spent in defending against the remarks was $250. Yockey also stated he arranged to pay $1,000 attorney's fees in the instant litigation, and that Elliott's accusations had caused him mental anguish, humiliation and suffering for which he should also be compensated.

---

**32.** Elliott also argues Beck's testimony would have been relevant to challenging the trial court's award of damages under the defamation counterclaims. The absence of an offer to prove also waives this issue, however, and thus precludes our review on appeal.

**33.** We observe the trial court made such award to the Yockeys on their individual cross-complaints without stating its judgment on a separate counterclaim which they jointly filed for recovery of $85.50 from the Elliotts, in addition to the $125 damage deposit the Yockeys al-

ready held (making a total of $210.50). As noted in the letter from Roach quoted earlier in this opinion, the Yockeys alleged there had been damage to the rented house, lost rental income, and that pursuant to the lease the Elliotts owed $25 for vacating in less than one year. Although the court did not specifically rule on such joint counterclaim, the issues involved therein were in essence resolved when the court held Elliott was entitled to recover $40 of his deposit from the Yockeys.

Similarly, Mrs. Yockey testified she was entitled to $1,000 attorney's fees, plus damages for her embarrassment and mental and physical suffering, which included apprehension that she might lose her real estate broker's license. She stated Elliott's remarks were the first such accusations against her in thirty–seven years of her professional career and that no other complaints had ever been filed against her broker's license.

Finally, Roach testified he also suffered mental anguish because of Elliott's defamations and that such remarks had damaged his professional reputation as as independent broker. In particular, he suggested that because of the untrue accusations, he found it necessary to defend himself not only before the Indiana Real Estate Commission, but also when he was interviewed during the month before trial by the membership committee of the Indianapolis Board of Realtors, which committee was reviewing his application for admission. A representative from the Board testified that although it had no authority to discipline non–members, and thus had not acted on Elliott's letter, such letter had been forwarded to the Board's attorney, who apparently retained it. Roach also stated he was entitled to be recompensated attorney's fees of $1,000.

 Our response to Elliott's argument on damages first observes the settled rule in this state that "[i]n the absence of evidence to the contrary, the jury may presume or infer that plaintiff's character is good; the burden of proof on the subject is on defendant." 18 I.L.E. *Libel and Slander* § 101 at 512 (1959), citing *Hallowell v. Guntle,* (1882) 82 Ind. 554. The trial court was thus clearly entitled to believe the counterclaimants enjoyed good reputations prior to Elliott's remarks, even in the absence of the specific evidence which was presented on this point.

Similarly, the traditional rule in Indiana as in most states has been, at least where defamation per se is involved, that "the law implies, infers, or presumes general damages as the natural and probable conse-

quences" of such defamation, and that "special" damages need not be shown. 18 I.L.E. *Libel and Slander* § 102 at 514 (1959), citing *Wayne Works v. Hicks Body Co.,* (1944) 115 Ind.App. 10, 55 N.E.2d 382, and *Tracy v. Hacket,* (1898) 19 Ind.App. 133, 49 N.E. 185. *See also Weenig v. Wood, supra,* and 50 Am.Jur.2d *Libel and Slander* § 350 (1970). Special damages, as opposed to such generally "presumed" damages, are not assumed to be necessary or inevitable results of the defamation, and must be shown by allegation and proof. They generally are of a pecuniary nature. *Id.* at 870.

A recent expression of the "general" damages rule appears in *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.,* (1974) 162 Ind.App. 671, 684 n.8, 321 N.E.2d 580, 589 n.8, *cert. denied,* 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976), where it is stated:

"Indiana law reflects the historic rule that publication in written form of statements *per se*—words which, on their face and without regard to extrinsic facts, tend to injure the reputation of another—subjects a publisher to liability although no harm to reputation is actually proved. Under the 'presumed damages' rule, juries may award substantial sums as compensation for supposed injury to reputation without any proof that such harm was actually suffered." (Citations omitted)

Elliott does not present an argument that words such as "misleading," "deceitful," "dishonest," "unscrupulous," or "unworthy" of trust are not defamatory per se when used in the manner alleged, and we believe his derogatory accusations would clearly fall within the traditional rule pertaining to inferred damages because on their face they would tend to injure the reputation of another. *See Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc., supra* and 18 I.L.E. *Libel and Slander* § 28 at 469–70 (1959), where it is stated "[w]ritten or printed words which impeach a person's reputation for honesty or integrity, or charge dishonesty or fraud, are libelous per se." Thus, even assuming *arguendo* Elliott

has correctly argued there was no evidence, apart from the counterclaimants' own testimony, that their reputations were harmed, it is evident his defamations would fall within the traditional rule relating to inferred damages, which requires no other evidence of actual injury.

Elliott implies in his reply brief, however, that the United States Supreme Court's decision in *Gertz v. Robert Welch, Inc.*, (1974) 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 has in essence overturned the traditional law relating to damages in all defamation actions. His particular argument, which cites Comment c to Restatement (Second) of Torts § 569 and § 620 (1977), "suggests" there may now be a severe constitutional limitation on "nominal" damages in defamation cases.

■ We first observe there is a distinction between such "nominal" damages, and the so–called general damage to reputation which has traditionally been inferred in cases of per se defamation. It is clear that nominal damages are awarded only when "the insignificant character of the defamatory matter, or the plaintiff's bad character, leads the jury to believe that no substantial harm has been done to his reputation. . .". Restatement (Second) of Torts § 620, Comment a at 317 (1977). Such nominal damages apparently involve a punitive element, and are imposed merely because it is assumed "[o]ne who is liable for a slander actionable per se or for a libel is liable for at least nominal damages." *Id.* at 317 (1977). Though perhaps indistinguishable in application from such nominal damages, in theory the general damages awarded at common law are compensatory in design, and intended to rectify the general but unproved damage to reputation that would normally be assumed to flow from a defamatory publication of the nature involved. Restatement (Second) of Torts § 621, Comment a at 320 (1977).

Returning to Elliott's argument regarding nominal damages, in Comment c accompanying § 620 of the Restatement, which he quotes as being applicable to the instant case, it is stated:

"In *Gertz v. Robert Welch, Inc.*, (1974) 418 U.S. 323, [94 S.Ct. 2997, 41 L.Ed.2d 789] the Supreme Court held that in order to recover for defamation, a plaintiff must prove that the defendant had knowledge or showed reckless disregard as to the falsity of the defamatory communication. (See § 508B). It also held that even though the defendant is negligent in this regard, general damages are constitutionally restricted 'to compensation for actual injury.' (See § 621). The purpose of the limitation was to prevent the giving of 'gratuitous awards of money damages far in excess of any actual injury'; *and since the common law doctrine of presumed damages invited damages by way of punishment rather than true compensation, it was held not to be justified under the First Amendment.*" (Emphasis added).

We do not agree the instant case necessarily involves an instance of "nominal" damages awarded punitively merely because the defamations might have been found by the judge to be insignificant or because the counterclaimants were believed to possess bad characters. We nevertheless pause to consider the impact of *Gertz* since the limiting language of that opinion is nowhere restricted to "nominal" damages, although the evil addressed clearly concerns "gratuitous" money awards which are unconnected to any actual injury.

In *Gertz*, the court was primarily concerned with defining the limits of the First Amendment protection for a publisher or broadcaster of defamatory falsehoods injurious to a private individual. The opinion reveals a Chicago policeman was convicted of murder, and that the victim's family hired Gertz, a reputable attorney, to represent them in civil litigation against the officer. An article in the defendant's magazine falsely stated Gertz had arranged the officer's "frame–up," and labeled him a "Communist–fronter," and incorrectly implied he had a criminal record. When Gertz sued for libel, the defendant–publisher responded he was entitled to invoke the privilege enunciated in *New York Times Co. v.*

*Sullivan,* (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, under which rule the publisher would escape liability unless Gertz showed the publication was made with so-called "constitutional malice," requiring either that the publisher knew his statements were false, or that he acted with a reckless disregard of their truth. The court observed that under such standard, "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 332, 94 S.Ct. at 3003. The trial court applied the *New York Times* test and granted a judgment *n. o. v.* for the publisher. In reversing, the *Gertz* Court determined that the *New York Times* recklessness standard is not constitutionally required where a private citizen is defamed, and that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 346–7, 94 S.Ct. at 3010.

For purposes of our decision here, the crucial reasoning of *Gertz* involves a limitation placed on the latitude thus given to the States. Although the *Gertz* Court recognized there is a strong state interest in compensating private individuals for injury to reputation–and that such interest must somehow be reconciled with the protections of the First Amendment–the Court also determined such state interest "extends no further than compensation for actual injury." *Id.* at 349, 94 S.Ct. at 3011. In remanding the case, the Court thus held, with respect to the question of damages, that because of the balance which must be struck, "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." *Id.* at 349, 94 S.Ct. at 3011. The Court reasoned the common law of defamation allowing recovery for "purportedly" compensatory damages must be modified to require proof of "actual injury" to be harmonized with the First Amendment. *Id.* at 349, 94 S.Ct. at 3011. It left the definition of the phrase "actual injury" to the state "trial courts." *Id.* at 349–50, 94 S.Ct. at 3011–12.

Our consideration of *Gertz* first observes that it is unclear whether the reasoning of that opinion was ever intended to apply to purely private defamation actions not involving print or broadcast media. The language of that case is replete with references to "newspapers," "broadcasters," "publishers," and the "media," although no subsequent decision of the Court has clarified whether its impact is so limited. The holdings in other jurisdictions reflect the uncertainty. Thus, although a variety of courts have determined the *Gertz* holding is inapplicable to totally private defamations, *e. g. Rowe v. Metz,* (1978) Colo., 579 P.2d 83; *Harley–Davidson Motorsports, Inc. v. Markley,* (1977) 279 Or. 361, 568 P.2d 1359, other authorities have concluded the reasoning of *Gertz* should be applied to all defamation actions, whether as a matter of constitutional mandate or state law. *Jacron Sales Co., Inc. v. Sindorf,* (1976) 276 Md.App. 580, 350 A.2d 688; Restatement (Second) of Torts § 621, Comment b (1977). *See generally Fopay v. Noveroske,* (1975) 31 Ill. App.3d 182, 334 N.E.2d 79 and *Hollander v. Pan American World Airways, Inc.,* (D.Md. 1973) 382 F.Supp. 96 (the latter discussing First Amendment law and private defamations prior to *Gertz.*)

Nor has an Indiana court interpreted the "actual damages" rule of *Gertz* as applying to all defamation actions, although we have held in a media case that the *New York Times* standard of recklessness should be used regardless of whether a public or private individual is defamed, where the statements in question concern an event or topic of general or public interest. *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc., supra.* As part of our reasoning in adopting such standard, this Court observed "[a] limit on the recovery of private citizens in libel actions to 'actual damages' would not operate to alleviate the uncertainties attendant upon the reasonable care standard adopted by the *Gertz* majority." *Id.* 162 Ind.App. at 684, 321 N.E.2d at

589. By thus adopting a recklessness standard in certain instances where private individuals are defamed, and rejecting the broad negligence test permitted by the *Gertz* court, we found it unnecessary to consider whether the counterbalancing rule regarding "presumed" damages is constitutionally applicable to all cases where recklessness is not shown.

We similarly believe the facts of the instant case do not require us to decide this disputed question. Rather, our review of the record discloses that even assuming the "presumed" damages prohibition of *Gertz* is applicable to the instant case, there is ample evidence of actual injury and of recklessness to meet an appropriate constitutional standard.

Our application of the *Gertz* rule against "presumed" damages requires some speculation as to what the court means by "actual" damages, since, as noted above, *Gertz* leaves the definition of that term to the "*trial* courts" (emphasis added) based on their "wide experience in framing appropriate jury instructions in tort actions." *Gertz v. Robert Welch, Inc., supra* 418 U.S. at 350, 94 S.Ct. at 3012. It has thus been observed in other jurisdictions "[i]t is not entirely clear what is meant by actual injury other than that it is not synonymous with special damages." *Harley–Davidson Motorsports, Inc. v. Markley, supra* 568 P.2d at 1361 n.3. The Supreme Court in *Gertz* did offer the following general guidance:

> "Suffice it to say that actual injury is not limited to out–of–pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury."

*Gertz v. Robert Welch, Inc., supra* 418 U.S. at 350, 94 S.Ct. at 3012.

■ In reviewing the record of the instant litigation, we find there unquestionably was competent evidence suggesting that Roach, a licensed real estate broker, suffered some damage to his professional reputation because of the derogatory letter circulated by Elliott. The facts show a copy of such letter, which called Roach "dishonest" and accused him of lying to Elliott and acting unscrupulously, was mailed to the Indianapolis Board of Realtors. Such letter was retained by the Board, apparently by its attorney. Pursuant to Roach's testimony, when he was considered for membership in that body a topic of conversation before the membership committee involved Elliott's letter and "the file on that letter." He further testified that at the time of trial he was still being considered for membership by the Board and remained concerned as to what affect the letter might have on his acceptance and reputation.[34] We believe that such evidence alone, though not involving any out–of–pocket loss, would allow an inference of "impairment" of reputation sufficient to support a factual determination of "actual injury" to Roach, even assuming the initial complaint to the Indiana Real Estate Commission was protected by a privilege. The evidence clearly established not only that the Board received and retained the defamatory letter, but also at least suggested the Board maintained a "file" on such letter and that the letter was thought to be relevant to Roach's application for membership in that body. We do not believe the Supreme Court intended any

---

**34.** His exact testimony was as follows:

"A. I am currently being considered for active membership on the Indianapolis Board of Realtors

Q. I see. Are you concerned that this letter that was sent to them might have some affect on your acceptance?

A. Yes, and I was–when I was interviewed by the Membership Committee within the last thirty (30) days, this letter and the file on that letter with the response on that letter from the Real Estate Commission was a part of that discussion, yes.

Q. And it required you to make some response to it to their request, right?

A. Yes, it did."

more precise showing, if one would generally be possible, of "impairment" of reputation and of "the more customary types of actual harm inflicted by defamatory falsehood." *Gertz v. Robert Welch, Inc., supra* 418 U.S. at 350, 94 S.Ct. at 3012. The same evidence would allow an inference, though not so persuasively, that the reputation of Alma Yockey, also a licensed broker, was similarly impaired, since it may be supposed the same retained letter would have a similar relevance to any application for membership she might make to such organization.

■ We find we need not assess the evidence of actual harm to the Yockeys, however, since, as we have already determined herein, there was persuasive evidence Elliott was reckless in his regard for the truth in his accusations against them. We now conclude such recklessness would satisfy the *New York Times* test of "constitutional malice" discussed *infra*.

Before applying such standard we again observe that in *Gertz*, the Court merely held the states may not permit recovery of presumed or punitive damages "*at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.*" *Gertz v. Robert Welch, Inc., supra* 418 U.S. at 349, 94 S.Ct. at 3011. The implication of such language is that presumed or punitive damages may be permissible where the defamer acts with such recklessness, that is, "constitutional malice," under the *New York Times* standard. Other courts have so interpreted the rule. *See, e. g., Jacron Sales Co., Inc. v. Sindorf,* supra, 276 Md.App. at 601, 350 A.2d at 700; and *Fopay v. Noveroske, supra,* 31 Ill. App.3d at 197, 334 N.E.2d at 92.

As noted above, the *New York Times* standard for malice, adopted to promote self expression by media while avoiding their self–censorship, requires either that the publisher knew that his statements were false, or that he acted with a reckless disregard for their truth. It is clear that "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth," *Gertz v. Robert Welch,*

*Inc., supra,* 418 U.S. at 332, 94 S.Ct. at 3003, although courts have held such failure may still be a "very important consideration." *Fopay v. Noveroske, supra,* 31 Ill.App.3d at 195, 334 N.E.2d at 90.

Of course, it is evident, as this Court has held, that showing a publisher's reckless disregard for the truth requires more than a mere demonstration that the published matter was factually incorrect. *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc., supra.* As the test was stated in *St. Amant v. Thompson,* (1968) 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for [the] truth."

■ Clearly, malice under such a test is distinguishable from common law malice, or ill will, hatred, or wanton desire to injure the person defamed. *Fopay v. Noveroske, supra,* 31 Ill.App.3d at 191, 334 N.E.2d at 87, citing *Cantrell v. Forest City Publishing Co.,* (1975) 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419; *Greenbelt Cooperative Publishers Association v. Bresler,* (1970) 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6; *Rosenblatt v. Baer,* (1960) 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597; *Garrison v. Louisiana,* (1964) 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125. Moreover, in considering whether constitutional malice was shown, we are cognizant the Supreme Court of the United States has imposed upon reviewing courts a duty to closely examine the record to determine whether it could constitutionally support a judgment. *Time, Inc. v. Pape,* (1971) 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45. On the other hand, however, that Court has also emphasized that "[w]here either result finds reasonable support in the record it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood." *Time, Inc. v. Hill,* (1967) 385 U.S. 374, 394 n.11, 87 S.Ct. 534, 545 n.11, 17 L.Ed.2d 456.

We conclude there was evidence for the fact–finder in the instant case to support a

conclusion that, at least so far as the Yockeys are concerned, Elliott acted not only with common law recklessness or malice as we have previously determined, but also with malice under the standard of *New York Times v. Sullivan, supra.* We first observe that by his own testimony, Elliott appears to have had almost no dealings with the Yockeys directly, although in his letter he labeled them dishonest, unscrupulous, and unworthy of the trust or patronage of their tenants. Elliott testified regarding only one communication with H. Kirkwood Yockey, a telephone conversation in early May, 1974, which Elliott stated he initiated in order to ask the Yockeys whether they wanted to buy his carpeting when the Elliotts vacated their home. Elliott indicated there was no mention of his damage deposit or of any specific date for his departure, and that Yockey merely referred him to Mrs. Yockey to discuss the carpet idea. Elliott testified he then called Mrs. Yockey, who by her undisputed testimony indicated that some question about a refund then came up, and that she advised Elliott to talk to Roach. Elliott also described a second telephone conversation with Mrs. Yockey, which took place in late August after he first called Roach. As noted earlier, Elliott stated Roach told him to refund his deposit, but that "[m]oments later Mrs. Yockey denied that any such conversation had ever taken place, indicating to me that Mr. Roach had lied to me on the phone at that time." Elliott also said Mrs. Yockey told him he would get a response the next day, which Elliott admits he received from Roach. He testified there was no further contact with the Yockeys after such conversation, and also stated he did not see either of them when he signed the lease and did not have any discussion with the Yockeys about its terms.

We believe such evidence at least permits the inference that Elliott circulated his letter accusing the Yockeys of being dishonest and unscrupulous merely to enhance the litigation which he commenced at the same time, and while manifesting a reckless disregard for the truth or falsity of his opprobrious accusations. He presents no evidence of their dishonesty or unscrupulousness. Indeed, Elliott's own testimony permits the inference he believed Roach had lied to him about having even discussed the deposit with the Yockeys, a conclusion which suggests Elliott did not actually believe the Yockeys were dishonestly endeavoring, as principals, to withhold such deposit. Similarly, as noted earlier in this opinion, it may be concluded he called the Yockeys "dishonest" merely because, as "principals", they had hired Roach—a circumstance suggesting he used such epithet recklessly even under the *New York Times* rule where it is evident Roach did not engage in even the alleged deceitful practices until sometime after he began working for the Yockeys. In conclusion, although we would not say such facts require a conclusion as a matter of law that Elliott acted recklessly, neither can we say they do not permit such inference so far as his statements about the Yockeys are concerned.

In so concluding Elliott was reckless in defaming the Yockeys, we determine not only that there was evidence he acted with reckless disregard for the truth or falsity of his damaging accusations, but also that a factfinder could conclude he was aware of the potential harmful effect of distributing such charges regarding an attorney and a real estate broker to various real estate organizations. In this context we find the following language in *Fopay v. Noveroske, supra,* 31 Ill.App.3d at 194–5, 334 N.E.2d 79, 90 to be helpful:

"Here, the defendant definitely was aware of the seriousness of his charges in that he used them as the basis for advocating plaintiff's dismissal. He certainly was aware of the possible harmful effect of these publications upon plaintiff's career when he mailed them to the national professional organizations, where they became part of plaintiff's permanent file, and to area hospitals, where plaintiff was likely to apply for employment. Consequently, we conclude that the jury could find the defendant was aware of the risk of harm created by these publications and, for the reasons set forth below, reck-

lessly disregarded the risk and published without a good faith belief in the truth of his allegations."

In *Fopay*, the defendant, who was chief radiologist at a hospital, was held to have falsely charged the plaintiff, the chief x–ray technician at the same hospital, with dishonesty and incompetence, and to have maliciously published such accusations by circulating four letters to other radiologists, hospitals, and representatives of national professional radiologists' organizations. The damaging letters were initially directed to the Lay Board of the hospital (much as the complaint in the instant litigation was initially directed to a proper body, the Indiana Real Estate Commission) with copies distributed to the other organizations. The *Fopay* Court concluded, as noted above, that on such facts one could reasonably find "an awareness by the defendant of the potentially harmful effect of the publication upon the plaintiff and the concomitant need for thorough investigation to insure that the publication is true." *Id.* at 194, 334 N.E.2d at 90. We also note that among the factors applied by the *Fopay* Court in ultimately finding *New York Times* malice was that in *Fopay*, as in the case at bar, there was no urgency for the publication of the document precluding investigation, and the letters in question did not request investigation, but involved only conclusions of illegal conduct.

In viewing all of the evidence in the instant case, we thus determine the trial court was entitled to believe, so far as the Yockeys were concerned, that Elliott acted with a reckless disregard for the truth even if the *New York Times* standard were applied in this case. And as noted above, we also believe there was specific competent evidence that Roach, at least, was actually harmed by Elliott's defamations.

 Based on the foregoing authority and the evidence presented, including the professional standing of the counterclaimants and the nature of the accusations against them, the damages of $1,500 to each of the Yockeys and $2,500 to Roach were not excessive.

## DAMAGES AWARDED TO ELLIOTT ON HIS COMPLAINT

Elliott finally contends, with respect to his own complaint, that the municipal court erred in awarding him only $40. He specifically contends such judgment is contrary to law in not finding $105 of his deposit was wrongfully withheld, that there is no evidence in the record which even suggests how the trial court arrived at its figure of $40, and that he was entitled to punitive damages on a theory he was injured by a willful and wanton breach of the rental contract.

With respect to the first of these arguments, we initially observe that Elliott concedes he owed the Yockeys *some* portion of the $125 damage deposit withheld by them, since even his amended complaint–which increased his original demand for return of only $64.50–sought $105 rather than the full amount. Moreover, although Elliott believed he owed only $18 to $20 for a discarded baseboard, we conclude there was competent evidence from which the trial court could conclude the damages were greater. Thus, there was evidence of repair expenditures of $35.50 made by the Yockeys, combined with testimony that Elliott's removal of baseboard at least contributed to a delay in renting the house, though he may not have been solely responsible for such delay.

 In response to the argument that it is unclear how the municipal court arrived at its award, we note that in *Valcan Corp. v. M. T. Sparks, Inc.*, (1968) 143 Ind.App. 543, 549, 241 N.E.2d 862, 865–66, the appellant argued there was no combination of claimed or disputed figures to support the trial court's award, to which the Appellate Court replied:

"[I]t is our opinion that the trial court was not required to make such a mathematical computation because there was record evidence of some thirteen items of extras furnished by the appellee which the trial court could allow or not allow, in addition to the balance due on the original contract; and that the matter of the computation of damages, if supported by

the record evidence, is strictly a matter within the sound discretion of the trial court, and it is our opinion that the trial court in this case did not abuse this discretion."

We similarly believe in the instant case that on the evidence presented the trial court did not abuse its discretion.

Nor can we say Elliott was entitled to the punitive damages he sought. He essentially argues the counterclaimants flagrantly disregarded his rights and willfully and wantonly breached their contract with him by withholding his deposit. He cites in support of such argument *Rex Insurance Co. v. Baldwin*, (1975) 163 Ind.App. 308, 323 N.E.2d 270 and *Vernon Fire & Casualty Insurance Co. v. Sharp*, (1974) 161 Ind.App. 413, 316 N.E.2d 381,[35] *rev'd in part on other grounds*, (1976) 264 Ind. 599, 349 N.E.2d 173. We observe, however, that the evidence in this context also supports the inference the parties merely acted in response to an honest disagreement regarding the terms and application of the lease. When the municipal court failed to award punitive damages to Elliott, it made a negative finding which will be set aside only if the evidence is uncontradicted with no reasonable inference in support of the negative finding. *Utopia Coach Corp. v. Weatherwax*, (1978) Ind.App., 379 N.E.2d 518, 526. Since the evidence on this issue was in conflict in the case at bar, we find no error in the failure of the trial court to award punitive damages. Having thus considered the various arguments raised by Elliott in this appeal, and having determined on the basis of the authorities and reasoning set out herein that no error was committed in awarding the judgments below, the decision of the municipal court is affirmed.

YOUNG, P. J., and CHIPMAN, J., concur.

---

**35.** Both cases stand for the general rule that punitive damages may be recovered where conduct of the wrongdoer indicates a heedless disregard of the consequences, malice, gross fraud, or oppressive conduct.